Jacob Markowitz, J.
This is an application to declare an elderly person in her early eighties incompetent and to have a committee appointed for her.
The facts in this case are fairly typical of the problems that confront many persons of advanced age and of their need of a service that provides needed protection and yet does not infringe upon their liberty and dignity any more than absolutely essential.
For many years, students of the needs of our senior citizens have urged the availability of procedures that would provide sufficient care and protection for the elderly without infringing their liberty and daily life pattern more than necessary.
In this case, a lady with a lifelong record of honorable professional activity and service to the community now finds herself too weak in mind and body to manage her finances and take care of her daily needs unaided. Yet she is fearful of being forced out of her home and being “ taken away.”
■She recalls her property and resources only intermittently. She is oriented in many respects, but has poor and recurringly fading memory, especially of recent (and current) matters and events.
She appears not to have the energy to maintain her person properly and to provide for her own sustenance. Her personal safety in getting about outside her home and need to be secure from the usual street and traffic hazards require some kind of assistance. It also appears that there is need for safeguarding her property and money.
Hitherto this elderly lady has been cared for first by a kindly young neighbor, who has now moved away, and then by a cousin, wife of petitioner, who now finds that the situation requires more complete oversight and continuous care, which is beyond the abilities of this cousin. She is presently cared for by two women, who serve as companion nurses, bathe her, see that she is fed and warm and look to her clothing and household.
The community organization concerned with the needs of aged people, whom petitioner’s wife consulted, expressed the basic principle that the “ idea is to keep people like [respondent] in their homes.” Petitioner’s wife agreed with this “ as long as she has companionship and .someone to supervise [her].”
The psychiatrist who testified at the hearing on this application advanced her opinion that this elderly lady was not capable *324 of taking care of her household duties because she was physically quite impaired and weak and that she is now incapable of organizing her household chores and managing her daily budget. This doctor also testified that the lady’s condition was 11 probably due to arteriosclerosis, given her age, the absence of any other kind of pathology.” However, the doctor refused to find that the lady was “ incompetent,” stating: “ If you ask me about a will, was she competent to make a will, I think she has some judgment remaining that she might be able to make a choice with the same, if you want, irrational likes and dislikes that most people make choices by.” The doctor also testified that her patient had expressed a strong fear that she ‘ ‘ was going to be sent away,” a fear undoubtedly not atypical in elderly people who do not wish to be removed from their homes. Moreover, she .said, the lady was ‘ ‘ fairly alert throughout the interview and she was fairly cooperative ”.
Meyer H. G-oldenkoff, Esq., thff guardian ad litem, and Jerry J. Mondora, Esq., the attorney for the petitioner, evinced an unusual concern and interest for their ward, for which they are to be commended.
One of the first studies in the State of this geriatric problem was made by a Special Committee of the Association of the Bar of the City of New York in co-operation with the Cornell Law •School. This committee, an interprofessional group of both the legal and the psychiatric professions, declared in its report:
“ Elderly and Senile Patients.
“ Recent increase in general life expectancy means that many older people must face continuing and increasing problems in their late years * * *
“We recognize that some older persons have mental illnesses which occur because of their age, particularly those brought on by progressive arteriosclerosis and other physical maladies. Although many of these patients cannot be cured, it may be necessary to care for them in mental hospitals.
“ A large number of older people, on the other hand, have no mental disturbance which comes under the heading of mental illness. They may be forgetful, or difficult to take care of, but their problems are not ones which require professional psychiatric care. These patients should not be in mental institutions. Even if there were no stigma whatever to hospitalization of older persons, they should be cared for in facilities specially designed to meet their needs. ’ ’ (Mental Hlness and Due Process, [Corpell IT. Press, 1962, at 43].)
*325 Commenting upon the New York procedures for the appointment of committees and other arrangements in the law for the limited care of the property of elderly patients in institutions, the Special Committee of the Bar Association commented: “ Provision should he made for managing the property of some persons whose mental illness is not serious enough to require hospitalization but who are unable to deal with the financial problems they must regularly face. In some cases, persons who cannot handle their affairs but who could be treated and cared for without entering a mental hospital are sent to an institution in order to simplify the procedure for appointment of a committee. For these persons, simple and informal procedures for the appointment of a conservator of their property might mean a chance for useful treatment in the community rather than admission to a mental institution.” (Mental Illness and Due Process, p. 41.)
The committee recommended that if a limited trial of the conservatorship idea was successful, “ a conservator should be authorized in the case of persons who are unable to care for their property and business interests whether or not they are hospitalized.” (Mental Illness and Due Process, p. 42.)
Taking up this suggestion, the Law Revision Commission of the State of New York thoroughly studied the proposal (N. Y. Legis. Doc., 1966, No. 65[Gr], pp. 261-351) and recommended the enactment of a statute. It was not then passed.
When the recodification of the Mental Hygiene Law • was enacted, however, in 1972 (L. 1972, ch. 251), article 77 of the new State Mental Health Code adopted the Law Revision Commission and Bar Association Committee conservatorship proposal practically unchanged, and, indeed, extended it even to mentally retarded persons.
It should be noted that this development in New York reflected the general movement nationally to provide for the protective needs of the elderly and the aged through use of a conservator.
(See for instance: Arnold, Preparing for a New Kind of Rainy Day: Planning for Aging, 42 N. Y. State Bar J. 603, 606 [1970] ;■ Symposium: Law and the Older Citizen, 53 Women Lawyers J., 84, 96 [1967]; Committee on Aging, Community Service Society, 1967 State Legislative Report, 23-24; Proceedings of a Seminar on Protective Service for Older People, Arden House, Harriman, New York, March, 1963; Developments In Aging — 1970—A Report of the Special Committee on Aging, United States Senate, Report No. 92-46 [1970] p. 32.)
On the record before me, I find that it is not necessary to declare respondent incompetent; it is sufficient to appoint a *326 conservator to take care of her property (Mental Hygiene Law, § 77.01).
Under the law (Mental Hygiene Law, § 77.19), a conservator has ‘‘ control, charge, and management of the estate, real and personal, of the conservatee, and [has] all of the powers and duties granted to or imposed upon a committee of the property of an incompetent appointed pursuant to article seventy-eight of this chapter * * * and shall have such additional
powers as the court in its discretion deems proper.” Moreover, to “ the extent of the net estate available therefor, a conservator shall provide for the maintenance and the support of the conservatee ” (Mental Hygiene Law, § 77.21). This, with the approval of the court and after the notice described in the law, may include “ a reasonable allowance for the personal use of the conservatee in such amount as the court may deem to be for the best interests of the conservatee ” (Mental Hygiene Law, §77.23).
Time enough to go beyond a conservator in the future should this at any time hereafter be found imperative to respondent’s welfare. Unless and until imperative, the court need not impugn the status of respondent or the soundness of her mind.
I have given careful consideration to the question of the person to be appointed conservator. On the picture overall, my conclusion is tjiat a nonfamily, resident conservator should be designated. In the order to be entered hereon, I shall appoint as such conservator Professor Fannie J. Klein of the New York University Law School, residing at 40 Washington Square So., New York, New York 10012.
Application for allowances shall be passed on in the order, as will the amount of the conservator’s bonds. Settle order accordingly, including provision authorizing the conservator to provide a reasonable allowance for the personal use of respondent.